FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

JUN 0 1 2015

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

SYLVIA PERKINS, as Personal Representative )
of the Estate of BOBBY MOORE, III, deceased, )
)
Plaintiff, )
)
v. )    Case No. 4:15CV310- BSM
)
JOSHUA HASTINGS, STUART THOMAS, in )    ***JURY TRIAL DEMANDED*
his individual and official capacities, and the )
CITY OF LITTLE ROCK, a municipality, )
)
Defendants. )    This case assigned to District Judge __Miller__
    and to Magistrate Judge _____Kay_____

## COMPLAINT

NOW COMES, Plaintiff, SYLVIA PERKINS, Personal Representative of the Estate of

BOBBY MOORE, III, deceased, by and through her attorneys, and for her cause of action, states

as follows:

### JURISDICTION AND VENUE

1.     This action arises under the United States Constitution, particularly under the

Fourth and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871

and 42 U.S.C. § 1983. This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and

1367. Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiff

complains arose in this District.

### PARTIES AND WITNESSES

2.     At all relevant times, BOBBY MOORE, III, ("BOBBY") was a citizen of the

United States of America and was, therefore, entitled to all legal and constitutional rights

afforded citizens of the United States of America. On August 12, 2012, BOBBY was fifteen

(15) years of age, and therefore, he was legally a minor on that date, per Arkansas Code

Annotated § 9-25-101. On August 12, 2012, and at all relevant times, BOBBY resided at 5 Dryad Lane, Little Rock, Arkansas.

3.  The heirs-at-law of BOBBY, namely SYLVIA PERKINS ("PLAINTIFF" and BOBBY's mother), Bobby Moore, Sr. (father), Shanika Perkins (sister) and Chearka Thomas (sister), Deazzaray Perkins (sister), Corderia Perkins (brother) and Bobby Moore Jr. (brother), are all citizens of the United States of America and, therefore, they are entitled to all legal and constitutional rights afforded citizens of the United States of America. PLAINTIFF is the court-appointed administrator of the Estate of BOBBY MOORE, III. *See* Pulaski County Circuit Court Letter of Administration attached as *Exhibit A*. PLAINTIFF brings this action on behalf of the estate and on behalf of BOBBY's heirs-at-law above.

4.  On August 12, 2012, and at all relevant times, JOSHUA HASTINGS ("HASTINGS"), was employed by the CITY OF LITTLE ROCK ("CITY") as a police officer, and was acting under the color of state law, within the scope of his employment. Prior to August 12, 2012, and at all relevant times, HASTINGS was ostensibly trained in police work, including, but not limited to, the Fourth Amendment of the United States Constitution, and was fully apprised of Little Rock Police Department ("LRPD") General Orders ("GO"), Rules & Regulations ("RR" or "rules") and Divisional Operating Procedures ("DOP")(collectively "policies").

5.  Terry Hastings ("Lt. Hastings" or "Capt. Hastings") is the father of HASTINGS. On August 12, 2012, Terry Hastings was a Captain with the LRPD. Prior to June 2012, Terry Hastings served at the rank of Lieutenant, as well as its Public Affairs Officer ("PAO").

6.  On August 12, 2012, and at all relevant times, STUART THOMAS, ("THOMAS"), was employed by the CITY as the LRPD Chief of Police, and acted under the

2

color of state law, and within the scope of his employment. At all relevant times, THOMAS had the ultimate responsibility within the LRPD for the protection of life, preservation of law and order, investigation of all crimes, and the enforcement of state laws and city ordinances. He had a duty to uphold the United States Constitution at all times. At all relevant times, the LRPD was an apparatus within the CITY, and functioned as an extension of the CITY, providing law enforcement.

7.     At all relevant times, including August 12, 2012, and for years prior thereto, THOMAS had final policy-making authority in terms of creating, adopting, implementing and/or enforcing policies within the LRPD, whether formal or informal. At all relevant times, including August 12, 2012, and for years prior thereto, THOMAS had final decision-making authority in terms of training, supervision, control and discipline of LRPD officers.

8.     Per GO 211 (*Internal Investigations, Citizen Complaints and Disciplinary Actions*), THOMAS is notified of all Early Intervention Systems ("EIS") alerts that LRPD officers trigger.

9.     Regarding EIS, GO 211 reads:

> "[t]he purpose of the Early Intervention System is to provide the Department with a procedure that: 1) Monitors actions taken by employees requiring administrative reporting and/or internal investigations or which may otherwise be indicative of work performance deficiencies; 2) Provides for supervisory review at all levels in the Chain of Command; and, 3) If deemed appropriate, provides for remedial action(s) or employee assistance to correct or eliminate identified job performance based deficiencies."

10.    GO 303 (*Use of Force*) provides for a Deadly Force Review Board ("DFRB"), the purpose of which is to review and evaluate incidents of firearms discharge which result in injury or death, by sworn members of the LRPD, while in the performance of their duties as police officers. In evaluating deadly force incidents, the DFRB reviews the LRPD investigation files

3

related thereto. Per GO 303, the objective of the DFRB is to make recommendations directly to the Chief concerning firearms discharge, training and supervision, in order to avoid future similar incidents.

11.     At all relevant times, LRPD rules were promulgated by THOMAS and approved by the legislative body of the City of Little Rock, per § 19-1604, Arkansas Statutes Annotated. LRPD rules mandate that their provisions shall be observed by all sworn members of the Department in order to maintain the confidence, respect and support of the community.

12.     On August 12, 2012, and at all relevant times, all LRPD patrol officers, including HASTINGS, were required to be apprised of the Fourth Amendment of the United States Constitution, the proper use of force, and were required to follow all LRPD policies at all times.

13.     On August 12, 2012, and at all relevant times, the CITY was a municipality organized and existing under the laws of the State of Arkansas. At all relevant times, the CITY was located in the County of Pulaski, State of Arkansas, and was the employer of the individually-named defendants. The CITY is and was empowered, funded and directed to pay any § 1983 civil rights judgment for compensatory damages, actual damages, and attorney fees for which any city employee acting within the scope of his or her employment is found liable. The CITY is an indemnification party for those liable in the acts of which PLAINTIFF complains.

14.     At all relevant times, the CITY was insured against lawsuits premised upon the actions or omissions of its police officers, within the scope of employment, which constitute violations of citizens' civil rights. The acts of which PLAINTIFF complains constitute a civil rights lawsuit against the CITY and CITY-employed defendants. The CITY is a primary or

4

secondary indemnification party regarding the acts of the CITY-employed defendants of which PLAINTIFF complains.

15.    At all relevant times, the CITY was a municipality which participated in the Municipal Legal Defense Program. The Municipal Legal Defense Program is a primary or secondary indemnification party regarding the acts of the CITY and the CITY-employed defendants of which PLAINTIFF complains.

16.    In regard to the excessive force alleged by Little Rock resident, Demetrius Curtis, in 2008, as reflected in LRPD File #08-4014, and case caption, *Curtis v. [LRPD officer], et al.*, the CITY settled Mr. Curtis' claim of excessive force against a certain LRPD officer(s), on behalf of that LRPD officer(s).

17.    In regard to Mr. Curtis' claim of excessive force against a certain LRPD officer(s), in the case styled *Curtis v. [LRPD officer], et al.*, the CITY, in fact, indemnified that LRPD officer(s).

18.    Prior to August 12, 2012, the CITY had paid monetary settlements for individual police officers who were sued under allegations of excessive force committed by the officers, within the scope of their employment.

19.    On August 12, 2012, and at all relevant times, GO 108 (*Administrative Procedures*) was in effect, and it authorizes the CITY to "defend an employee in a court action, brought against him for an act or alleged act, which was performed as a result of his responsibilities and consistent with his regularly assigned duties, as an employee" of the CITY. GO 108 authorizes the CITY to "defend an employee and/or pay damages," in lawsuits brought against employees, including those premised on civil rights violations.

5

## FACTUAL ALLEGATIONS

20.     In *Monroe v. Pape*, 365 U.S. 167 (1961), the United State Supreme Court had

cause to examine the Ku Klux Klan Act of 1871. In *Pape*, the Court quoted congressional

descriptions of the violence historically committed by the Ku Klux Klan, and state governments'

tolerance of the violence:

> "'While murder is stalking abroad in disguise, while whippings
> and lynchings and banishment have been visited upon unoffending
> American citizens, the local administrations have been found
> inadequate or unwilling to apply the proper corrective.
> Combinations, darker than the night that hides them, conspiracies,
> wicked as the worst of felons could devise, have gone unwhipped
> of justice.  Immunity is given to crime, and the records of the
> public tribunals are searched in vain for any evidence of effective
> redress..."  "[C]ertain states have denied to persons within their
> jurisdiction the equal protection of the laws.  The proof on this
> point is voluminous and unquestionable...[M]en were murdered,
> houses were burned, women were outraged, men were scourged,
> and officers of the law shot down; and the State made no
> successful effort to bring the guilty to punishment or afford
> protection of the law to these persons...one main scourge of the
> evil – perhaps the leading one – was the Ku Klux Klan..."'
> *Monroe v. Pape*, 365 U.S. 167, 175, 81 S. Ct. 473, 477-8 (1961).

21.     The violent, lawless and racist history of the KKK is well-documented, and, at all

relevant times, the CITY, through THOMAS and other supervisory officials, was fully aware of

the historical violence carried out by the KKK.

22.     From 2000 through 2010, African-Americans comprised approximately 40% of

the population in Little Rock.

23.     THOMAS and Capt. Hastings attended the Little Rock Police Academy together

as classmates, graduating in 1978.  They started their careers at the LRPD at the same time.

THOMAS and Capt. Hastings have been friends for many years, and at all relevant times.

6

24.     In 2004, THOMAS retired from the LRPD at the rank of Assistant Chief. Following his retirement, THOMAS was employed as a manager at a golf course. When the position of LRPD Chief of Police opened later in 2004 or in 2005, THOMAS applied for it. In 2005, THOMAS was hired by the CITY as LRPD Chief of Police.

25.     HASTINGS graduated from high school in 2004. In 2006, while THOMAS was Chief of Police, HASTINGS applied to become a Little Rock police officer.

26.     In early-to-mid 2006, the CITY, through THOMAS and other supervisory officials, learned that police candidate HASTINGS had attended a KKK meeting, with his friend, when HASTINGS was a junior in high school.

27.     In August 2006, during an official investigation of HASTINGS' background in the application process, HASTINGS reported to the CITY that he "lost contact with [the friend] about a year ago and [does] now know what his number is or where he lives today."

28.     Though the full name of HASTINGS' friend was disclosed during the investigation, neither THOMAS, nor any employee of the CITY, ever attempted to locate HASTINGS' friend in order to verify HASTINGS' account of the KKK meeting. In a deposition in a prior cause, THOMAS could not explain why the LRPD never attempted to locate HASTINGS' friend.

29.     Though HASTINGS was able to identify the friend with whom he attended the KKK meeting by his full name in 2006, and though that friend's full name was contained in LRPD records, later, in 2011, HASTINGS publicly said he did not remember the friend's name. When publicly asked about the identity of the friend in 2011, HASTINGS responded, "I don't have no contact with him no more, and I don't remember his name. It's been so long ago since I talked to him."

7

30.     On January 25, 2007, Lt. Johnnie Gilbert, an African-American officer with the

LRPD, submitted an official memorandum to Captain Patrice Smith, voicing his concerns on the

possible hiring of HASTINGS.

31.     In his January 25, 2007 memorandum, Lt. Gilbert wrote:

> "Hastings provided a written explanation indicating that he was
> only curious about what was going on at the [KKK] meeting. I
> have serious reservations regarding this applicant's judgment and
> maturity. How does a person go about attending a Ku Klux Klan
> meeting? Who are his friends and associates? Why would he
> place himself in such a bad position based on his upbringing as the
> son of a police officer? How does this organization justify to the
> public the hiring of an applicant who has had a one-time peripheral
> association with the Ku Klux Klan? The views of this subversive
> group to undermine the American government and to suppress
> minorities (sic) groups are common knowledge.
>
> The Civil Service Commission has established criteria when
> considering applicants for employment. One broad standard is
> 'moral turpitude'. Hastings' behavior of attending a Ku Klux Klan
> meeting is an abomination. The actions of the applicant are so
> extreme that I cannot in clear conscious (sic) endorse his
> employment with the Little Rock Police Department. Applicants
> in the past have been disqualified for similar affiliations.
>
> In summation, I do not recommend that applicant Joshua Hastings
> is employed as a Little Rock Police Officer. The background
> investigation has provided valuable information that makes
> Hastings an unfavorable candidate and a potential liability for the
> Little Rock Police Department."

32.     Prior to the hire of HASTINGS by the CITY, Lt. Gilbert identified HASTINGS as

a potential liability for the LRPD.

33.     Despite the warnings of Lt. Gilbert, who THOMAS agrees is a "dedicated public

servant," THOMAS, in March 2007, authorized the hiring of HASTINGS as a Little Rock police

officer.

8

34.    At all relevant times, the CITY, through THOMAS and other supervisory officials, attempted to downplay and conceal HASTINGS' background, and the fact that the CITY had knowingly hired an individual that had attended a KKK meeting in his past.

35.    HASTINGS' official start date with the LRPD was April 30, 2007.

36.    Sgt. Corey Hall was designated by the CITY, through THOMAS and other supervisory officials, to supervise HASTINGS, and evaluate his performance during his probationary period.

37.    Prior to Sgt. Hall's supervision of HASTINGS, the CITY had sustained the following allegations against Sgt. Hall:

   a)    Violation of RR 1/4002 (*"Officers shall not engage in any conduct which constitutes conduct unbecoming an officer or neglect of duty"*), when a complainant alleged that Sgt. Hall stole $100.00 from him, and struck him with his fist;

   b)    Violation of GO 302 (*Operation of Departmental Vehicles*);

   c)    Violation of GO 110 (*"Employees will attend at the time and place indicated when served in person or by telephone with a subpoena"*); and

   d)    Violation of RR 1/3006.00 (*"Officers may go armed at all times off duty, but only within the jurisdiction of the City of Little Rock or enroute to or from duty"*), 1/3007.00 (*"No officer, when dressed in civilian clothes, shall wear a weapon in such a manner that it will attract attention or be open to the view of the public outside Departmental offices"* ), 1/4002.00 (*"Conduct unbecoming"*), 1/4003.00 (*"Discredit to Department"*) and 1/2002.00 and GO 302, when Sgt. Hall was arrested in Oklahoma after a domestic battery incident with the mother of his son, wherein Sgt. Hall allegedly pointed his gun in a man's face during the dispute.

38.     Prior to 2007, and at all relevant times, the CITY, through THOMAS and other supervisory officials, were fully aware of Sgt. Hall's discipline history, his demonstrated disregard of LRPD policies, and his pattern of inappropriate uses of force.

39.     Despite this awareness, the CITY, through THOMAS and other supervisory officials, chose Sgt. Hall, an officer with a significant discipline history, to supervise HASTINGS during his probationary period.

40.     In 2009, the CITY sustained allegations of domestic battery against Sgt. Hall, and suspended him for ten (10) days.     In 2011, the CITY sustained allegations of Conduct unbecoming, Intoxication in public and Terroristic threats against Sgt. Hall, when he became involved in a fight with the staff of a local tavern, and terminated him.

41.     On February 1, 2008, and again on March 1, 2008, in official memoranda, one of HASTINGS' supervisors identified deficiencies in HASTINGS' report writing.     Each of these memoranda was signed off on by HASTINGS' chain of command.

42.     Between his April 30, 2007 hire date and April 1, 2009, the CITY sustained the following allegations against HASTINGS:

> a)     Violation of GO 316 (*Mobile Video Recording Equipment*);
>
> b)     Violations of GO 301 (*"Incident Reports must be prepared for all Police Incidents"* and *"Employees shall submit all Incident Reports to supervisory personnel at or before the end of their tour of duty, during which the information contained in the report was received."*) when HASTINGS failed to write and submit reports, inadequately coded calls and submitted incident reports with incorrect information;
>
> c)     Violation of GO 110 (*"Missing court date"*), when HASTINGS missed court dates for which he was to be a witness; and
>
> d)     Violation of GO 304 (*Storage of Property*), GO 305 (*Impoundment of Vehicles*) and DOP 5500-8, when

10

> HASTINGS "released a possible suspect following a
> burglary that had occurred. In addition, [HASTINGS]
> failed to properly store the driver licenses located in the
> suspect vehicles and failed to properly notify the Crime
> Scene Search Unit regarding the impoundment of the
> vehicles and the need to be processed for any evidence."

43. On April 1, 2009, HASTINGS triggered an EIS alert (#09-21) because he exceeded the allowable uses of force within one (1) year.

44. Of the individuals identified in EIS alert #09-21, upon whom HASTINGS used force, over 80% were African-American.

45. In a May 20, 2009 official memorandum, one of HASTINGS' supervisors concluded that no further action was necessary for HASTINGS' EIS alert #09-21, and that "the flagging of Officer Hastings should be considered a 'False Alarm.'" THOMAS concurred with the supervisor's recommendation, and wrote "*Concur–No further ST*" at the bottom of the memorandum.

46. HASTINGS was named LRPD "Officer of the Month" for April 2009, as reflected in a July 8, 2009 letter signed by THOMAS.

47. Between April 1, 2009 and April 26, 2010, the CITY sustained the following allegations against HASTINGS:

> a)    Violation of GO 303 (*Use of Force-reporting*), when
>       HASTINGS failed to report his use of force upon an
>       African-American man to his supervisor;
>
> b)    Violation of RR 1/3009.00 (*"Reckless handling of or
>       reckless damage to city property"*) when HASTINGS was
>       involved in a motor vehicle accident;
>
> c)    Violation of RR 1/3009.00 when HASTINGS lost control
>       of a CITY vehicle, and caused a motor vehicle accident;
>       and

11

d)      Violation of RR 1/4001.09 (*"Use of loud, indecent, profane or harsh language in the performance of official duties or in the presence of the public"*), when he used profane language toward a subject.

48.     On February 3, 2010, HASTINGS triggered a second EIS alert (#10-05) because he again exceeded the allowable uses of force within one (1) year.

49.     Of the individuals identified in EIS alert #10-05, upon whom HASTINGS used force, 70% were African-American.

50.     In April 2010, in response to HASTINGS' EIS alert #10-05, Sgt. Cristie Phillips was approved by the CITY, through THOMAS and other supervisory officials, to monitor HASTINGS.

51.     In an April 13, 2010 official memorandum regarding HASTINGS' EIS alert #10-05, Sgt. Phillips wrote, "I have reviewed the file information and find no pattern of behavior or actions that cause me to be concerned with Officer Hastings performance. I will, as his Supervisor, continue to monitor his performance."

52.     Prior to Sgt. Phillips' monitoring of HASTINGS due to EIS alert #10-05, the CITY had sustained the following allegations against Sgt. Phillips:

        a)      Violation of RR 1/8010.05 (*"Taking any other action which interferes with the efficiency or integrity of the administration of criminal justice"*);

        b)      Violation of GO 110 (*"Employees who have a pending case in any court shall contact the appropriate Prosecuting Attorney to discuss the facts and circumstances surrounding the case"*), which was referred to by her supervisor as "a serious offense";

        c)      Violation of RR 1/4002.00 (*"Conduct unbecoming"*), 1/4003.00 (discredit to Department), 1/5006.00 (*"Failure or deliberate refusal of any officer to obey a lawful order given by a supervisory officer of this Department shall be considered insubordination"*) and 1/8003.00 (*"Officers*

12

> *shall be truthful at all times, whether under oath or not,*
> *when conducting official police business "*); and

d)      Violations of GO 207 (*"All officers are required to*
        *complete an annual retaining program..."*) and RR
        1/5006.00 (*"Insubordination"*) for refusing to complete her
        Supervisor's In-Service Training after being given a direct
        order to do so by her supervisor.

53.     As a result of Sgt. Phillips' violations of 1/4002.00, 1/4003.00, 1/5006.00 and

1/8003.00, THOMAS suspended her, and his February 2, 2007 Letter of Suspension read:

> "[y]ou violated the aforementioned sections of the Rules and
> Regulations on September 9, 2006, when you sent two threatening
> e-mails to [woman].  On September 25, 2006, you were ordered,
> per Chief Thomas to have no contact with [woman].  On October
> 6, 2006, you observed [man]...and [woman] at a local restaurant.
> You made an anonymous phone call to [woman] at the restaurant
> and then hung up after identifying yourself as 'Monica.'  Your
> supervisor questioned you about this phone call, which you denied.
> The next day, you contacted your supervisor and advised that you
> had in fact called [woman] at the restaurant."

54.     Prior to February 2010, and at all relevant times, the CITY, through THOMAS

and other supervisory officials, as well as HASTINGS, were fully aware of Sgt. Phillips'

discipline history, and her demonstrated untruthfulness and insubordination.

55.     Despite this awareness, the CITY, through THOMAS and other supervisory

officials, chose Sgt. Phillips, an officer with a significant discipline history, to monitor

HASTINGS due to EIS alert #10-05.

56.     Sgt. Phillips was terminated by the CITY in 2011 for policy violations when she

became involved in a physical altercation, and was determined to have been untruthful to her

supervisors, the Internal Affairs Division and a judge.

57.     On April 26, 2010, HASTINGS triggered a third EIS alert (#10-27) because he

again exceeded the allowable uses of force within one (1) year.

13

58.     In an April 30, 2010 official memorandum, in response to EIS alert #10-27, Assistant Chief of Police David P. Rowan recommended that HASTINGS receive "additional monitoring and intervention by his supervisors" for a period of six (6) months starting May 1, 2010.   THOMAS concurred with Chief Rowan's recommendations, and wrote "*Concur. Proceed. ST*" at the bottom of the memorandum.

59.     Between April 26, 2010 and January 4, 2011, the CITY sustained the following allegations against HASTINGS, most of which occurred while he was being monitored by EIS:

    a)     Violation of RR 1/4001.09 (*"Use of loud, indecent, profane or harsh language in the performance of official duties or in the presence of the public"*), when HASTINGS use profane language during a traffic stop;

    b)     Violations of GO 300 (*Communications Center Functions*), GO 302, RR 1/5006.00 (*"Insubordination"*), DOP 5500-3 and DOP 5500-4, when HASTINGS: i) left his district to respond to a call in another Division; ii) failed to notify Communications he was responding to assist on the dispatched call; iii) failed to activate his emergency equipment or notify Communications while driving a Code 3 status; iv) drove at unsafe speeds disregarding traffic signals; v) provided Communications with an incorrect location when he was dispatched to another call; vi) failed to sign out necessary equipment at the beginning of his shift; and vii) failed to obey a corrective action provided to him during a previous investigation by his supervisors concerning his driving habits;

    c)     Violation of GO 303 (*Use of Force*), when HASTINGS failed to document his use of force on an African-American man; and

    d)     Violation of RR 1/4001.09 (*"Loud, indecent, profane or harsh language"*), when HASTINGS used profane language during an arrest of an African-American woman, which one of HASTINGS' supervisors called "a continuing issue" with him.

14

60.     While being monitored by his supervisor due to EIS alert #10-27, HASTINGS violated a direct order not to exceed 85 miles per hour while operating a patrol car. HASTINGS' exceeding 85 mile per hour was deemed "justified," and approved by THOMAS, who wrote "*S.T.*" at the bottom of the memorandum regarding the violation.

61.     While being monitored by his supervisor due to EIS alert #10-27, HASTINGS was the subject of additional disciplinary files.

62.     In a deposition in a prior cause, THOMAS stated his opinion that HASTINGS was not taking his monitoring for police misconduct seriously in 2010, by virtue of the fact that HASTINGS incurred more discipline while he was being monitored.

63.     While being monitored by his supervisor due to EIS alert #10-27, on August 11, 2010, HASTINGS used force on an African-American man with prosthetic hands. In an August 12, 2010 official memorandum, Sgt. Phillips reported that she had a meeting with HASTINGS about his use of force on the man with prosthetic hands, and at the meeting, they "discussed and reviewed what objects should be considered deadly weapons."

64.     While being monitored by his supervisor due to EIS alert #10-27, THOMAS required HASTINGS to attend "Training Recruit Class #70, Use of Force," and HASTINGS completed this re-training by August 14, 2010.

65.     In August 2010, video footage from March 2010 of an LRPD officer using a racial slur against African-American Little Rock citizens, and flashing his police badge, surfaced on the internet. The CITY had been aware of this LRPD officer's actions since May 2010.

66.     The video footage of the LRPD officer using the racial slur and flashing his police badge was uploaded to YouTube, went "viral," and caused public controversy in Little Rock.

15

67.    On January 6, 2011, the CITY sponsored a "Little Rock Racial and Cultural Diversity Forum" to discuss rising racial tensions among Little Rock citizens, particularly Little Rock's African-American community.

68.    At the January 6, 2011 forum, an African-American Little Rock citizen, openly and in the company of other Little Rock citizens, criticized the CITY, and asked how it could justify hiring HASTINGS as a police officer, when it knew, prior to the hire, that HASTINGS had attended a KKK meeting.

69.    THOMAS, who was present at the forum on behalf of the CITY, responded to the citizen's question by stating that the question was an "utter and complete mischaracterization of what happened in that incident." THOMAS further stated:

> "...I would not ever, at any point in time, hire anybody that I thought was a member of a subversive group, was a danger to this community or a danger to this society. And anybody that says that [Josh Hastings] is a member of an organization or willingly attended a membership (sic) of a subversive organization is not believable."

70.    The citizen then asked "[s]o, you had no knowledge of [Josh Hastings] going to the meeting?" THOMAS did not respond, and turned his back on the citizen. The forum ended shortly thereafter.

71.    On or about January 7, 2011, the Little Rock public interest blog "Corruption Sucks" published an online article entitled "Man Accuses Little Rock Police Chief of hiring a known Ku Klux Klan Member." The January 7 article featured video footage from the forum, and the questions about HASTINGS posed to THOMAS.

72.    On or about January 15, 2011, Lt. Hastings posted an online response to the January 7 article on "Corruption Sucks." In his response, Lt. Hastings wrote:

16

During recent times the Hastings family has had 6 family members serving as decorated LRPD officers. My brother recently retired with 38 years service (sic). I will complete 35 years in June. All together at this time our family has 109 years combined service to the Department and this great city. I would defy anyone to find one minute of that time where any member of this family has been racist.

It is disheartening that 3 or 4 officers can take an innocent incident that occurred during a young officer's youth and use it for their own personal agenda. The effort of this young officer to be honest and assure the department that he would never knowingly or willingly be involved in such a thing has been proven by investigation and his years of service as a LRPD officer.

What is even sadder is that these 3 or 4 officers would exaggerate and lie about this incident to to (sic) criticize one of the best chiefs this Department has ever had, along with one of the finest city managers little (sic) Rock has had and our distinguished Board of Directors. These officers say they want fairness and harmony in the Department, but yet they use their fellow officers in an effort to further their personal agendas.

It is our family's desire, and we believe the majority of the Department's officers, that we find unity and peace to better serve the Department and the citizen's (sic) of Little Rock. I have seen this desire in the many officers, black and white, who have come to me and this young officer [HASTINGS], to apologize for the actions of these few officers. The men and women of the LRPD have assured me that these few officers do not speak for them!

We all call on these officers to put aside their personal agenda. Let's work together to build harmony that we might serve the citizen's (sic) of this great city united.

73.     In response to legitimate public concern that the CITY had employed a police officer who has a background that includes an association with the KKK, Lt. Hastings publicly referred to his "young" son's attendance at the KKK meeting as an "innocent incident" which was being used to further certain LRPD officers' "personal agenda."

17

74.     The statements and actions of THOMAS and Lt. Hastings at the January 6, 2011

forum, and Lt. Hastings' online posting, reflect the CITY's attempts to downplay HASTINGS'

background, and conceal it from the public.

75.     Between January 4, 2011 and June 25, 2012, the CITY sustained the following

allegations against HASTINGS:

a)     Violation of GO 316 (*Mobile Video Recording Equipment*),
       by HASTINGS during an arrest where force was used;

b)     Violation of GO 316, when HASTINGS failed to activate
       his body microphone in the field;

c)     Violations of RR 1/4002.00 (*"Conduct unbecoming"*), RR
       1/4006.00 (*"No officer shall ridicule, taunt, or belittle any
       person at any time.     Neither shall he/she willfully
       embarrass, humiliate, nor shame any person nor do
       anything that might incite any person to violence"*), by
       HASTINGS during an arrest where force was used;

d)     Violation of GO 316, when HASTINGS failed to manually
       activate his camera while transporting a suspect to the
       Detective Division;

e)     Violations of GO 301 (*"Employees shall submit all
       Incident Reports to supervisory personnel at or before the
       end of their tour of duty, during which the information
       contained in the report was received"*) and DOP 5500-9
       (*"Whenever officers come upon or are called to the scene
       of any dead body, officers shall take immediate steps to:
       notify a Patrol Division supervisor"*), when HASTINGS
       responded to a dead body call but failed to submit an
       incident report until two weeks later;

f)     Violations of GO 110 (*"Failed to honor subpoena"*), when
       HASTINGS failed to respond to subpoenas issued by the
       CITY in criminal court on six (6) occasions between May
       and November 2011, which resulted in the dismissals of
       charges against DWI suspects; and

g)     Violations of RR 1/4002.00 (*"Conduct unbecoming"*) and
       RR 1/5020.00 (*"Officers are prohibited from engaging in
       the following activities while on duty: Sleeping, loafing or*

18

> *idling"*), when HASTINGS failed to respond to a status
> check from Communications while his supervisor and
> another officer were attempting to contact him, and
> HASTINGS was later found asleep parted behind a church
> in his patrol vehicle by another officer.

76.     HASTINGS' violations of GO 110, where he missed court dates as a witness for

the CITY, were brought to the attention of THOMAS by Thomas M. Carpenter, in an official

memorandum dated December 3, 2011. In his memorandum, Mr. Carpenter wrote:

> "This memorandum addresses a problem that has led to the
> dismissal of traffic prosecutions including prosecution for driving
> while intoxicated. A few weeks ago I contacted your office about
> a problem with officers missing court dates. The problem subsided
> with one major exception – Officer Josh Hastings…I understand
> that from time to time there are circumstances beyond the officer's
> control which can result in a missed court date. But, there is a
> frequency here that has caused problems for this office. I am
> particularly concerned with a DWI case has to be dismissed when
> the officer is not there to prosecute."

77.     In a deposition in a prior cause, THOMAS acknowledged that HASTINGS'

multiple failures to appear in court caused dismissals of DWI charges, and this potentially

endangers the streets of Little Rock.

78.     On June 25, 2012, the CITY received a call from Interface Alarm Company,

which advised that it had received an alarm with glass breakage at a business, City Market.

HASTINGS and another officer were dispatched to City Market to check on the situation.

HASTINGS claimed that he went to City Market, physically checked the scene, including the

doors and windows, and did not notice any evidence of a break-in. HASTINGS drafted an

official report, stating "All doors and windows were locked and secure," and he described the

matter as a "false alarm."

19

79.     Later in the morning on June 25, 2012, the manager of City Market, who was still present at the scene, called the LRPD, and complained that no officer ever physically responded to his burglary call.

80.     On June 27, 2012, THOMAS initiated an Internal Affairs investigation of the matter, and HASTINGS' actions on June 25, 2012 were reviewed to determine if he had engaged in a Dereliction of Duty, and if he was untruthful about his actions.

81.     On June 28, 2012, in an official statement, the City Market manager told LRPD investigators that he had reviewed the store's surveillance video. He reported that the burglar could be seen breaking the front window with a rock, knocking the window out, and entering the store. The manager also told investigators that the video footage showed a police car drive by the front doors of City Market about ten minutes after the break-in, but the car did not stop, and no officer ever exited the car.

82.     At some point prior to July 10, 2012, the CITY, through THOMAS and other supervisory officials, received and reviewed the June 25, 2012 surveillance video from City Market, and the video was consistent with the representations of the City Market manager.

83.     The June 25, 2012 surveillance video from City Market proved that HASTINGS did not physically check the premises as he had reported, and proved that he was untruthful when he reported that he did physically check the premises.

84.     On July 10, 2012, HASTINGS gave an official statement to LRPD investigators in reference to the incident at City Market. HASTINGS told the investigators that his MVR was not working on the evening on June 25, 2012, so he did not have any video footage of his actions.

20

85.    HASTINGS told the investigators that he "responded to the call," "parked" his vehicle, and "got out and walked up to the doors." He stated that he "checked the windows, looked at them to make sure because [he] saw that they were tall ten foot pane glass windows and if those broke out you could tell they were broken out." HASTINGS told the investigators that he "walked up to the front door and took [his] hands and put them on the door, on the upper part of the door and pulled on them..."

86.    During his July 10, 2012 official statement, after HASTINGS was shown the store surveillance video, he was asked the following questions, and gave the following answers:

> Q:    Okay, I showed you a video that showed the guy breaking in the- breaking in the place?
>
> A:    Yes sir.
>
> *****
>
> Q:    Did any of that video reflect when you walked up to the front of the business to check the door?
>
> A:    No sir it did not.
>
> Q:    Can you uh- is there some explanation why?
>
> A:    I- I do not have an explanation and I- I have replayed it back in my mind and talked with [officer] about it and he told me, he said yes, you gave me a thumbs up from the front door so –to reaffirm that I walked up to the front door.
>
> Q:    Could you have walked- could you have possibly, thinking back on it, actually had been further back in the front of the business and looked at it and seen everything was secure and then left without walking up to the front doors?
>
> A:    I- I can't replay the night you know play by play.
>
> Q:    Right.
>
> A:    But what I remember-

21

Q:     But you're- you're a hundred percent sure you walked up to the front door?

A:     Yes sir, I'm hundred percent sure I walked up to the front door because like I said, Officer [] told me, you gave me the thumbs up from the front door so then I returned back to my vehicle...

87.     In July 2012, the CITY knew that HASTINGS did not physically check the front doors of City Market on June 25, 2012, as he claimed that he did.

88.     In July 2012, the CITY knew that HASTINGS was untruthful during an official investigation about his response to the scene of the burglary at City Market on June 25, 2012.

89.     Despite knowing in July 2012 that HASTINGS did not physically check the scene of the burglary at City Market on June 25, 2012, and despite knowing that he was untruthful about the matter during an official investigation, the CITY failed to promptly discipline HASTINGS.

90.     Despite knowing in July 2012, that HASTINGS violated RR 1/4002.00 (*"Conduct unbecoming"*) and RR 1/8003.00 (*"Untruthfulness"*) in regard to his June 25, 2012 response to the burglary at City Market, the CITY allowed HASTINGS to resume his activities as a patrol officer.

91.     On August 12, 2012, less than one month after HASTINGS gave his official statement in regard to the burglary at City Market, he shot and killed BOBBY ("*Moore* shooting"), after responding to a suspicious person call at the Shadow Lake Apartments.

92.     Prior to the *Moore* shooting, HASTINGS was instructed to wait for back-up before approaching any persons he saw in the apartment parking lot.

93.     Shortly thereafter, HASTINGS saw a vehicle containing BOBBY preparing to exit the apartment parking lot. Despite the clear instruction that he was given to wait for back-

22

up, HASTINGS disregarded it, and instead placed himself in the pathway of the vehicle, with his gun drawn.

94.     The vehicle containing BOBBY stopped, and was several feet away from HASTINGS.

95.     The vehicle containing BOBBY was placed in reverse gear, and began to move backward, away from HASTINGS, when HASTINGS opened fire on the vehicle, and BOBBY, who was seated in the vehicle.

96.     At no time prior to the *Moore* shooting was HASTINGS' life or safety jeopardized, and yet, despite his awareness of this fact, he made the intentional, conscious decision to fire his weapon in order to inflict severe physical damage to BOBBY.

97.     HASTINGS was trained in the appropriate use of force for police officers, and, in fact, attended "Training Recruit Class #70, Use of Force," on or before August 14, 2010. Therefore, HASTINGS was fully aware that an officer may not use deadly force in situations where his life and safety, or those of others, is not in danger.

98.     Evidencing HASTINGS' awareness of the maliciousness of his wrongful acts were his repeated instances of untruthfulness to LRPD investigators about material aspects of the *Moore* shooting, including HASTINGS' location when he fired his weapon, his normal method of firing his weapon, the location of the vehicle he fired into, the position of BOBBY when he was shot, and other material facts. HASTINGS' attempts to conceal his acts of August 12, 2012 demonstrate his awareness of the wrongful nature of those acts, and also demonstrate his maliciousness.

23

99.     HASTINGS' presence at the Shadow Lake Apartments, and his actions while there, were performed as a result of his police responsibilities, and were consistent with his regular assigned duties as an employee of the CITY.

100.    Per policy, the CITY initiated two (2) investigations into the *Moore* shooting.

101.    During the *Moore* shooting investigations, HASTINGS told investigators that BOBBY was in a vehicle that drove directly at HASTINGS as he identified himself, and shouted for the vehicle to stop.  HASTINGS told investigators that he feared the vehicle was about to strike him and, having no time or space to retreat, he fired his service weapon at the vehicle. HASTINGS told investigators that the vehicle continued past him a short distance up a slight incline, then rolled backwards some distance, and ultimately collided with a parked car in the apartment parking lot.

102.    On or about September 7, 2012, Sgt. James Lesher signed an affidavit in which he attested that he had probable cause to believe that HASTINGS committed the crime of Manslaughter, in violation of A.C.A. § 5-10-104, when he killed BOBBY on August 12, 2012.

103.    On or about September 7, 2012, in an official CITY press release about the *Moore* shooting, THOMAS stated, "I have reviewed this matter and have concluded that the incident did not occur in the manner represented by [HASTINGS] and that the use of deadly force did not conform to Departmental Orders."  THOMAS further stated, "The evidence developed during the course of the investigation(s) indicates that the vehicle approaching [HASTINGS] had, in fact, stopped several feet from him and that the driver was in the process of reversing direction when the shots were fired."

104.    By September 7, 2012, THOMAS knew that HASTINGS was untruthful during the LRPD investigations of the *Moore* shooting.

24

105. HASTINGS was not terminated by the CITY until October 18, 2012.

106. As reflected in a October 18, 2012 Letter of Termination from THOMAS, HASTINGS was terminated from the LRPD based on the *Moore* shooting, and also based on the City Market burglary incident which had occurred almost four (4) months prior, on June 25, 2012.

107. As reflected in THOMAS' October 18, 2012 letter, the CITY determined that HASTINGS violated RR 1/4002.00 (*"Conduct unbecoming"*) and 1/8003.00 (*"Untruthfulness"*) on June 25, 2012, in regard to the City Market burglary and investigation.

108. Though it was determined by the LRPD that HASTINGS was, in fact, untruthful about his actions during the *Moore* shooting investigations, THOMAS' Letter of Termination did not include a violation of 1/8003.00 (*"Untruthfulness"*) in regard to the *Moore* shooting investigation.

109. The CITY sustained three violations of GO 303 (*Use of Force*) against HASTINGS in regard to the *Moore* shooting.

110. The *Moore* shooting was reviewed by the DFRB, which included Mr. Carpenter. The DFRB identified several areas of concern regarding the CITY's investigation of the *Moore* shooting, including discrepancies among witness statements, missing investigation documents and materials, an incomplete case file summary, failures to collect and process physical evidence, and other investigation deficiencies.

111. Prior to the *Moore* shooting, Lt. Hastings pressured his good friend, THOMAS, and tried successfully to influence THOMAS' disciplinary decisions so that HASTINGS received minimal punishment for his prior misconduct and violations of policy.

25

112.    Prior to the *Moore* shooting, the CITY, through THOMAS and other supervisory officials, had exonerated HASTINGS for each and every use of force he committed, or in which he was involved.

113.    At all relevant times, the CITY kept statistics on the racial background of apprehended criminal suspects, and individuals upon whom LRPD officers used force during encounters in the field.

114.    Prior to the *Moore* shooting, the majority of Little Rock citizens upon whom HASTINGS used force were African-American or non-white.

115.    During HASTINGS' five year career as an LRPD officer, the CITY, through THOMAS and other supervisory officials, sustained more than forty (40) separate violations of policy against HASTINGS, including violations of GO's 110, 300, 301, 303, 304, 305, 316; Rules 3009.00, 4001.09, 4002.00, 4006.00, 4009.00, 5020.00, 8003.00; and DOP's 5500-3, 5500-4, 5500-8, 5500-9.

116.    During HASTINGS' career as an LRPD officer, the CITY, through THOMAS and other supervisory officials, ordered that at least forty (40) days of suspension be served by HASTINGS for various violations of policy.

117.    In depositions in a prior cause, both THOMAS and Lt. Hastings testified that if HASTINGS had been terminated for any of his prior police misconduct or violations of policy, BOBBY would be alive today.

## COUNT I
## HASTINGS FOR EXCESSIVE FORCE
## IN VIOLATION OF THE FOURTH AMENDMENT

118.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and seventeen (117) as and for Paragraph one-hundred and eighteen (118) of Count I.

26

119.   HASTINGS used excessive force against BOBBY's person, causing great injury, pain and death.

120.   THOMAS has publicly stated that HASTINGS' use of deadly force in the *Moore* shooting was unjustified.

121.   The force used by HASTINGS was unnecessary and unreasonable, and BOBBY's great injury, pain and death resulted directly from the use of said force, which was excessive.

122.   By reason of the conduct of HASTINGS, BOBBY and his heirs-at-law were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

123.   The violence committed by HASTINGS, and inflicted upon BOBBY was unnecessary, objectively unreasonable and excessive and was, therefore, in violation of his Fourth Amendment Rights. Therefore, HASTINGS is liable to PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including loss of life, conscious pain and suffering and punitive damages.

WHEREFORE, PLAINTIFF prays for judgment against HASTINGS, in an amount which will fully and fairly compensate PLAINTIFF for damages suffered.

## COUNT II
## THOMAS AND THE CITY FOR FAILURE TO TRAIN, SUPERVISE AND DISCIPLINE LRPD OFFICERS, AND FOR MAINTAINING A WIDESPREAD CUSTOM OF EXCESSIVE FORCE AND UNTRUTHFULNESS

124.   PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and twenty-three (123) above as and for Paragraph one-hundred and twenty-four (124) of Count II.

125.   At all relevant times, including August 12, 2012, and for years prior thereto, THOMAS and the CITY knowingly, and with reckless and deliberate indifference to the constitutional rights of the citizens of Little Rock, failed to adequately train, supervise and

27

discipline LRPD officers, and maintained a widespread "custom" of excessive force and untruthfulness, so as to constitute an informal policy. THOMAS and the CITY perpetuated this custom by:

a) disregarding, ignoring and/or covering up allegations or facts of excessive force committed by HASTINGS and other LRPD officers in the field;

b) tolerating serious police misconduct committed by HASTINGS' and other LRPD officers;

c) failing to terminate or appropriately discipline HASTINGS and other LRPD officers for serious police misconduct and violations of policy;

d) allowing HASTINGS and LRPD officers to be untruthful during official CITY investigations and while providing official statements;

e) allowing LRPD officers with significant disciplinary histories to train and supervise HASTINGS and other LRPD officers;

f) failing to appreciate, address and act upon evidence of the training and skills deficiencies of HASTINGS' and other LRPD officers;

g) allowing LRPD officers to modify and change their official statements in materials aspects without confrontation from the CITY;

h) historically exonerating LRPD officers' uses of deadly force in which those officers falsely claimed that vehicles driven by individuals were being used as an instrument of deadly force against them, even though the objective evidence demonstrated otherwise; and

i) failing to terminate chronic policy violators and police misconduct repeat offenders among LRPD ranks.

126.    This pattern of excessive force, police misconduct and administrative failures was so pervasive as to constitute a custom with the force of law.

28

127.    Prior to August 12, 2012, and at all relevant times, LRPD officers, including

HASTINGS, were fully aware of the CITY's tolerance of excessive force, police misconduct and

administrative failures, and were fully aware that the tolerance of this pattern constituted a

custom with the force of law.

128.    The custom described above was the moving force behind the violations of

BOBBY's constitutional rights committed by HASTINGS, and proximately caused BOBBY's

personal injuries, great pain and death.    The custom described above proximately caused a

deprivation of the rights, privileges and immunities secured to BOBBY and his heirs-at-law by

the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted

thereunder.

129.    As a result of the custom described above, BOBBY was subjected to excessive

force, and caused to die.    Therefore, THOMAS and the CITY are liable to PLAINTIFF in

damages under 42 U.S.C. § 1983, including loss of life, loss of liberty interest, conscious pain

and suffering and punitive damages.

WHEREFORE, PLAINTIFF prays for judgment against THOMAS and the CITY, in an

amount which will fully and fairly compensate PLAINTIFF for damages suffered.

## COUNT III
## HASTINGS FOR WRONGFUL DEATH
### Pursuant to Arkansas Code § 16-62-102(a) and (b)

130.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-

hundred and twenty-nine (129) above as and for Paragraph one-hundred and thirty (130) of

Count III.

131.    On August 12, 2012, HASTINGS owed the duty to maintain public order and to

enforce at all times all such laws, ordinances and regulations for the preservation of good order

29

and the public welfare, including the duty to follow all such laws, ordinances and regulations. HASTINGS owed the duty to refrain from malicious conduct and actions, in the performance of his duties as an LRPD officer.

132.    Disregarding those duties and in breach thereof, HASTINGS was guilty of one more of the following acts which proximately caused BOBBY's death:

> a)    maliciously and unreasonably shot and killed BOBBY without legal justification.

133.    HASTINGS' foreseeable actions were within the scope of his employment, incidental to his duties as an LRPD officer.

134.    By reason of this wrongful death, BOBBY and his heirs-at-law have incurred pecuniary damages and severe mental anguish.

135.    PLAINTIFF brings Count III pursuant to Ark. Code. Ann. § 16-62-102(a) and (b) which provides for damages whenever the death of a person shall be caused by a wrongful act notwithstanding the death of the person.

WHEREFORE, PLAINTIFF prays for judgment against HASTINGS in an amount which will fully and fairly compensate PLAINTIFF for damages suffered.

## COUNT IV
## HASTINGS FOR SURVIVAL
### Pursuant to Arkansas Code § 16-62-101(a)(1)

136.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and thirty-five (135) above as and for Paragraph one-hundred and thirty-six (136) of Count IV.

137.    On August 12, 2012, prior to his death, BOBBY suffered personal injuries and great pain proximately caused by the wrongful acts of HASTINGS, which included shooting BOBBY multiple times.

30

138.    By reason of the wrongful acts of HASTINGS, BOBBY incurred personal injuries and great pain, as well as damages in the form of loss of life.

139.    PLAINTIFF brings Count IV pursuant to Ark. Code. Ann. § 16-62-101(a)(1) which provides for damages for wrongs done to a person, and further provides that such an action may be brought after the death of the person by his executor.

WHEREFORE, PLAINTIFF prays for judgment against HASTINGS in an amount which will fully and fairly compensate PLAINTIFF for damages suffered by BOBBY.

## COUNT V
## THOMAS AND THE CITY FOR SINGLE-ACT SUPERVISORY LIABILITY

140.    PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and thirty-nine (139) above as and for Paragraph one-hundred and forty (140) of Count V.

141.    Prior to hiring HASTINGS as a police officer and CITY employee, THOMAS and the CITY were fully aware that HASTINGS had attended a KKK meeting.

142.    Prior to the *Moore* shooting, and at all relevant times, the CITY, through THOMAS and other supervisory officials, endeavored to conceal from the public the fact that one of its officers, HASTINGS, had attended a KKK meeting prior to being hired as an employee of the CITY.

143.    Prior to the *Moore* shooting, THOMAS and the CITY were fully aware that African-Americans were disproportionately represented among those upon whom HASTINGS used force during his career.

144.    HASTINGS' attendance at the KKK meeting foreshadowed that he would bear an animus or hostility toward African-Americans while working patrol in Little Rock.

31

145. In 2007, Lt. Gilbert understood that HASTINGS' attendance at the KKK meeting foreshadowed that HASTINGS would bear an animus or hostility toward African-Americans, and he informed the CITY, through THOMAS and other supervisory officials, of this fact.

146. Appropriate scrutiny and appreciation of HASTINGS' pre-employment background and/or employment history would have led a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire HASTINGS was that he would deprive an African-American Little Rock citizen's federally protected rights.

147. The CITY, through THOMAS and other supervisory officials, consciously disregarded the high risk that HASTINGS would commit excessive force upon an African-American Little Rock citizen, such as BOBBY.

148. There was a direct link between HASTINGS' pre-employment background and/or employment history and the risk of excessive force against an African-American Little Rock citizen that HASTINGS posed.

149. The CITY's decisions in hiring and retaining HASTINGS, and PLAINTIFF's constitutional injuries, are closely connected, with HASTINGS' background and employment history being the links.

150. The CITY, through THOMAS and other supervisory officers, further disregarded the high risk that HASTINGS would commit excessive force upon an African-American Little Rock citizen, such as BOBBY, by selecting officers with significant disciplinary histories, and sustained violations of policy involving insubordination, untruthfulness and violence, to train and supervise HASTINGS.

151. The acts and omissions of the CITY described above were the moving force behind the violations of BOBBY's constitutional rights committed by HASTINGS, and

32

proximately caused BOBBY's personal injuries, great pain and death. The acts and omissions described above also proximately caused a deprivation of the rights, privileges and immunities secured to BOBBY and his heirs-at-law by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

152.   As a result of the acts and omissions described above, BOBBY was subjected to excessive force and caused to die. Therefore, THOMAS and the CITY are liable to PLAINTIFF in damages under 42 U.S.C. § 1983, including loss of life, loss of liberty interest, conscious pain and suffering and punitive damages.

WHEREFORE, PLAINTIFF prays for judgment against THOMAS and the CITY, in an amount which will fully and fairly compensate PLAINTIFF for damages suffered.

## COUNT VI
## THOMAS AND THE CITY FOR SUBSTANTIVE DUE PROCESS VIOLATIONS

153.   PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and fifty- two (152) above as and for Paragraph one-hundred and fifty-three (153) of Count VI.

154.   The Due Process Clause of the Fourteenth Amendment forbids the CITY from depriving any person of life, liberty, or property, without due process of the law.

155.   At all relevant times, each of BOBBY's heirs-at-law possessed a liberty interest in his or her familial relationship with BOBBY.

156.   At all relevant times, BOBBY was an African-American 15-year-old boy.

157.   The actions and behavior of THOMAS in hiring HASTINGS as a LRPD officer, despite THOMAS' knowledge that HASTINGS attended a KKK meeting, and despite knowing that HASTINGS would necessarily interact with African-American Little Rock citizens while

33

on patrol, were egregious, outrageous, and shocked the conscience, and were a direct and proximate cause of BOBBY's death and PLAINTIFF's damages.

158. In hiring HASTINGS, an individual who attended a KKK meeting, as an armed LRPD officer and in failing to properly train and supervise him, THOMAS created a danger for African-American Little Rock citizens, such as BOBBY, that BOBBY would otherwise not have faced.

159. By failing to appreciate, address and act upon the disproportionately high rate African-American Little Rock citizens upon whom HASTINGS used force, THOMAS created a unique risk of harm to BOBBY, which was greater than the risk faced by the general public.

160. THOMAS' conduct put BOBBY at significant risk of serious, immediate and proximate harm, and said risk was obvious or known to THOMAS.

161. Despite this knowledge, THOMAS acted recklessly, and in conscious disregard of the risk.

162. THOMAS' actions were egregious, outrageous, and shocked the conscience, and were a direct and proximate cause of BOBBY's death and PLAINTIFF's damages.

163. Based on these circumstances, THOMAS and the CITY owed BOBBY a duty to protect him from HASTINGS, a state-created danger, and they each breached said duty.

164. As a result of the actions described above, BOBBY was subjected to excessive force and caused to die. Therefore, THOMAS and the CITY are liable to PLAINTIFF in damages under 42 U.S.C. § 1983, including loss of life, loss of liberty interest, conscious pain and suffering and punitive damages.

WHEREFORE, PLAINTIFF prays for judgment against THOMAS and the CITY, in an amount which will fully and fairly compensate PLAINTIFF for damages suffered.

34

WHEREFORE, Plaintiff, SYLVIA PERKINS, by and through her attorneys, and requests

judgment against the Defendants and each of them:

> 1. That Defendants be required to pay PLAINTIFF's compensatory damages;
>
> 2. That Defendants be required to pay actual damages;
>
> 3. That Defendants be required to pay attorney fees per 42 U.S.C. § 1988; and
>
> 4. That PLAINTIFF have any other such relief as this Honorable Court deems just and proper.

Respectfully submitted,

Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFF
Walkup, Melodia, Kelly & Schoenberger
650 California Street, 26th Floor
San Francisco, CA 94108
Telephone: (415) 981-7210
Facsimile: (415) 391-6965
E-mail: mlaux@walkuplawoffice.com

35

ELECTRONICALLY FILED
2012-Sep-19 16:24:57
60PR-12-1656

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
PROBATE DIVISION

No. 60PR-12-1656

IN THE MATTER OF THE ESTATE OF BOBBY JOE MOORE III

### LETTER OF ADMINISTRATION

SYLVIA PERKINS, whose address is 306 DRYAD LANE, LITTLE ROCK, AR 72205,

having been appointed and qualified as administratrix of the estate of BOBBY JOE

MOORE, who died on or about 08/12/2012, is hereby authorized to act as

administratrix for and in behalf of the estate and to take possession of the estate's

property as authorized by law.

ISSUED this date: <u>19-SEP-2012</u>

LARRY CRANE, CIRCUIT CLERK

By:

A TRUE COPY CERTIFIED THIS
*Letters of Administration*
**LARRY CRANE**
**CIRCUIT COUNTY CLERK**
BY:
**DEPUTY CLERK**





# EXHIBIT A